IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

DORIN F. FERGUSON,

                Plaintiff,                OPINION AND ORDER

   v.

                                                21-cv-593-wmc

DONNA MCMARTIN,
KAYLENE BETANCOURT,
AMERICA ROCHA, BRETT COOK,
and JOSHUA CRAFT,

                Defendants.

Dorin Ferguson, an inmate represented by counsel, claims that staff at Columbia Correctional Institution ("Columbia") ignored his lower-bunk restriction resulting in his falling from a top bunk and injuring his elbow. The court previously granted Ferguson leave to proceed against these defendants on Eighth Amendment deliberate indifference and Wisconsin negligence claims. Ferguson and defendants have since cross-moved for summary judgment. (Dkt. #29 and Dkt. #39.) For the following reasons the court will deny plaintiff's motion, as well as grant in part and deny in part defendants' motion.

UNDISPUTED FACTS[1]

### A. Parties

Ferguson was incarcerated at Columbia at all times relevant to this lawsuit. At the times relevant to the lawsuit, the defendants were employed by the Wisconsin Department of Corrections and working on the Columbia prison staff as follows: Donna McMartin (Unit Manager), Joshua Craft (Correctional Sergeant), Kaylene Betancourt (Correctional Sergeant), America Rocha (Correctional Officer) and Brett Cook (Correctional Sergeant).

### B. Ferguson's Medical History and Bed Restriction

As background, Ferguson has lived with diabetes since he was 12 years old, and has been largely uncontrolled. Uncontrolled diabetes can lead to nerve damage (neuropathy), which causes tingling, numbness, burning, pain or loss of feeling. In 2017, Ferguson was also shot in the left elbow, for which he received no immediate medical care. When he did eventually see a doctor after being shot, the doctor told him that a piece of bone had broken

---

[1] Ferguson filed his complaint without an attorney, but he was able to secure counsel to represent him at summary judgment. His complaint is also unsigned and does not comply with 28 U.S.C. § 1746. Despite the assistance of counsel, Ferguson's response to defendant's motion also does not comply with the court's procedures for summary judgment motions, which are attached to the court's pretrial conference order, dkt. #19. Specifically, Ferguson did not respond to each of defendants' proposed findings of fact, nor did he file his own set of proposed findings of fact, though defendants construed Ferguson's initial brief in support of his motion for summary judgment (dkt. #28), as his statement of facts. Thus, the court will also deem defendants' proposed findings of fact undisputed with one exception. Where Ferguson's complaint contradicts defendants' version of events, the court will accept those assertions as long as they may reasonably be within his personal knowledge or supported by a reasonable inference. However, the court notes that this is not the first time plaintiff's counsel has failed to comply with this court's summary judgment rules. *E.g.*, *Peterson v. Wright*, No. 21-CV-799-JDP, 2023 WL 5448027, at *1 (W.D. Wis. Aug. 24, 2023). **Thus, the court specifically warns counsel that his continued failure to follow procedures may well result in the court wholly adopting the opposing party's proposed findings of fact to the detriment of his future clients.**

off his elbow, but he has received no further care for that injury. Apparently, Ferguson's injury has prevented him from fully extending or flexing his left elbow ever since, and he reported persistent numbness and tingling in his left fourth and fifth fingers, as well as an aching pain in his left elbow.

In July 2019, an x-ray of Ferguson's left elbow showed no fracture or dislocation of his left elbow, but it did show an old bone fracture, bone spurs and degenerative joint disease at that elbow. (Dkt. #37-1, at 128.) That same month, Ferguson reported that he could not fully extend or flex his elbow, constant tingling in his fourth and fifth fingers, and constant elbow pain. In August 2019, Ferguson continued to report elbow aches and tingling in his finger; and in October 2019, he confirmed chronic pain since his gunshot wound. As of October 2019, Ferguson was 5 feet 11 inches tall and weighed 364 pounds. (Dkt. #37-1, at 1.) Finally, in January 2020, Ferguson further complained that he was in pain and unable to fully extend his left arm.

In early January of 2020, Ferguson still slept in an upper bunk, but later that month, a doctor restricted him to a lower bunk because he was morbidly obese and had limited range of motion in his left elbow. (Dkt. #37-1, at 54.) As a result, on January 23, a nurse entered a lower-bunk restriction into the prisoner database per a doctor's order. (Dkt. #32-2, at 3.) All correctional staff could access that database.

C. Ferguson's Bed Restriction and Fall

On January 27, apparently in response to his new restriction, Ferguson attests that Sergeant Craft told him of a plan to move him to a different cell *with* an open lower bunk, although Ferguson was not moved that day. (Compl. (dkt. #1) ¶ 16.) Again, the very next

3

day, Craft allegedly told Ferguson that he would move him to a different cell with a lower bunk, but once more did not actually move him, even after Ferguson "pleaded" with him to be allowed to change cells. (*Id.* ¶¶ 18-19.)

Sargeant Craft offers a different version of these events. Instead, he avers that on an unspecified date, after Ferguson had received his lower-bunk restriction, he showed Craft a piece of paper stating that Ferguson had a lower-bunk restriction. (Craft Decl. (dkt. #33) ¶ 10.) After verifying the restriction in the prisoner database, Craft then offered to move him to another cell with an available lower bunk, but *Ferguson refused* because he wanted to share a specific cell with a friend. (*Id.* ¶¶ 11-12.) Since he had declined to change to the designated cell that day, Craft instead left a sticky note in the unit logbook stating that Ferguson still needed to be moved to a lower bunk. (*Id.* at ¶ 15.) Later, Craft claims he again offered Ferguson multiple choices for cells where he could have a lower bunk, but he refused all of them because he did not want to live with the inmates in those cells. (*Id.* ¶ 18.) As a result, Craft eventually told Ferguson that if he wanted to move to accommodate his medical restriction, he needed to move immediately to one of the available cells; otherwise, if he wanted to share a cell with his friend, he would need to submit a written request. (*Id.* at ¶ 19.) Ferguson still refused to move, and Craft did not further discuss the move with him. (*Id.* at ¶¶ 20-21.)

Even though she was required to review the unit logbook for detailed information, Unit Manager McMartin attests that she did not know that Ferguson had a lower-bunk

4

restriction.² More specifically, McMartin attests that she did not review the logbook for detailed information at all, believing her only responsibility was to review it to ensure that staff were following documentary standards. (McMartin Decl. (dkt. #34) ¶ 16.) Further, McMartin does not recall seeing Sargeant Craft's note in the logbook during her "cursory" reviews. (*Id.* ¶ 17.)

On January 29, Ferguson alleges that he specifically told Sargeant Betancourt about his lower-bunk restriction, and she acknowledged seeing the medical restriction order but did not move him to a lower bunk. (Compl. (dkt. #1) at ¶¶ 20-21.) One day later, Ferguson also alleges he "pleaded" with Sargeant Cook and Officer Rocha to move him to a lower bunk, and though both had reviewed the medical restriction order, they still did not move him to a lower bunk. (*Id.* ¶ 22-23.) Defendants Betancourt, Cook and Rocha all dispute these allegations, asserting that he never told them of the lower-bunk restriction. (Betancourt Decl. (dkt. #32) ¶ 13; Cook Decl. (dkt. #36) ¶ 13; Rocha Decl. (dkt. #35) ¶ 10.)

Regardless, it is undisputed that Officer Rocha lacked the authority to move inmates from one cell to another, and if she was presented with such a request, she could only inform the duty sergeant. (Rocha Decl. (dkt. #35) ¶¶ 7, 9.) Because he was new to the

---

² Ferguson asserts that Unit Manager McMartin received the lower-bunk restriction on January 23, 2020, Craft informed her of the order on January 27 and 28, and she saw the restriction in the unit logbook. (Compl. (dkt. #1) ¶ 24.) However, these facts are not within Ferguson's personal knowledge. Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge"). Ferguson also asserts that McMartin observed the "bad condition," but it is unclear what that means, and regardless does not show that she had personal knowledge of the restriction. (Compl. (dkt. #1) ¶ 25.)

5

position, Sergeant Cook also attests that he did not move inmates without approval from the Unit Manager during the relevant period. (Cook Decl. (dkt. #36) ¶¶ 8-9.)

On January 31, 2020, Ferguson rolled out of the top bunk while asleep and landed on his left arm. Only then did unspecified prison staff move him to a lower bunk. A few days later, Ferguson submitted an inmate complaint for not having been moved to a lower bunk sooner and his resulting fall. An institution complaint examiner later affirmed his complaint, noting that "McMartin has acknowledged this unfortunate error." (Dkt. #39-1, at 1.)

### D. Treatment for Ferguson's Elbow Injury

After his fall, Ferguson also reported numbness in his fourth and fifth fingers on his left hand, an inability to open or close his hand independently, and difficulty bearing any weight with his left arm. In response, a nurse gave Ferguson a sling and sent him to a local emergency room. There, an x-ray revealed bone spurs and possible degenerative joint disease but no fracture or dislocation. (Dkt. #37-1, at 128.) The emergency room doctor's notes also indicated that Ferguson's left elbow was tender, with continued tenderness along the ulna through his left forearm. The doctor added that Ferguson could wiggle all of his fingers, but the range of motion appeared to be limited by effort and pain. Diagnosing him with a bruise on his elbow, the doctor recommended Tylenol and ibuprofen, a sling for a couple of days, ice therapy, and a follow-up appointment with an orthopedist.

In February of 2020, Ferguson was seen by an orthopedist. Notes of that visit reflect that Ferguson reported being shot in the left arm, but having his arm return to normal function months later. However, in his declaration, Ferguson's treating physician, Dr.

6

Justin Ribault, explained this report is contradicted by his medical history, as he had reported pain and tingling in his arm since being shot. (Ribault Decl. (dkt. #37) ¶ 38.) Ferguson's doctors focused on treating his diabetes in the months following his fall.

Nearly twenty months after his fall, in September 2021, Ferguson again reported to a nurse that he had had chronic pain in his elbow since he got shot, which had worsened "when the [correctional officers] broke it." In October 2021, an orthopedist further opined that Ferguson was suffering from medial instability in his left elbow that resulted in ulnar neuropathy. In December 2021, Ferguson also saw a doctor at UW Orthopedics, who diagnosed him with "cubital tunnel syndrome" (neuropathy of the ulnar nerve) and opined that some of it may have been related to the gunshot wound. That orthopedist recommended bracing and occupational therapy.

After months of therapy, Ferguson had an electromyography in May 2022 and was diagnosed with severe, left ulnar neuropathy. At an October 2022 follow-up appointment with UW Orthopedics, the doctor noted that Ferguson had "experienced pain, numbness, and tingling in the small and ring fingers of the left upper extremity since January of 2020," along with weakened grip strength, and had "a history of a gunshot wound to the left forearm." (Dkt. #37-1, at 88.) In February 2023, Ferguson underwent left cubital release surgery, but continued to report tingling in his fourth and fifth fingers and pain in his left elbow after the surgery. At a June 2023, follow-up appointment, Ferguson reported some improvement in the tingling in his fourth and fifth fingers, but also reported continuing numbness in those digits, along with weakness in his left hand. He added that he had ongoing left elbow pain, which worsened his range of motion.

Dr. Ribault stated in his declaration that "it is not my opinion that Ferguson's fall from his bunk on January 31, 2020[,] had a significant impact on the pathology of his elbow." (Ribault Decl. (dkt. #37) ¶ 121.) Dr. Ribault also noted that plaintiff's diagnosis before and after his fall were substantially similar. (*Id.*) Moreover, Dr. Ribault noted that Ferguson experienced consistent symptoms before and after the fall -- limited range of motion in his elbow, hand weakness and numbness, and tingling in his fourth and fifth fingers. (*Id.*) As a result, Ribault concluded that it was more likely than not that the untreated gunshot wound contributed more to the osteoarthritis and cubital tunnel syndrome in his left elbow than did his fall from the bunk, and that these conditions were further complicated by his uncontrolled diabetes. (*Id.* ¶ 122.)

## OPINION

A party is entitled to summary judgment if the movant shows that there is no genuine dispute as to any material fact, and judgment is appropriate as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). While defendants and plaintiff both moved for summary judgment on plaintiff's Eighth Amendment and state-law negligence claims, the evidence strongly favored defendants, so the factual summary was largely written in a light most favorable to plaintiff as the non-moving party. Once a moving party makes a showing that the undisputed evidence establishes entitlement to judgment beyond reasonable dispute, then to survive summary judgment, the non-moving party must provide contrary evidence "on which the jury could reasonably find for the nonmoving party." *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406-407 (7th Cir. 2009) (alteration adopted) (quoting *Anderson*, 477 U.S. at 252).

The Eighth Amendment gives prisoners the right to receive adequate medical care. *Estelle v. Gamble*, 429 U.S. 97 (1976). It is well established that "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Id.* at 104 (quotation marks and citation omitted). To prevail on a claim of constitutionally inadequate medical care, an inmate must demonstrate two elements: (1) an objectively serious medical condition; and (2) a state official who was deliberately (that is, subjectively) indifferent. *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019); *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011).

Defendants all assert that they were not deliberately indifferent to plaintiff's serious medical needs, having failed to establish that his bruised elbow was sufficiently serious to invoke constitutional protection. However, a jury could find that plaintiff's medical conditions, including weakness in his left hand and arm and the obvious obesity that caused a doctor to enter a lower-bunk restriction, was sufficient to put them on notice of a serious medical need for a lower bunk, and that at least some of the defendants failed to act reasonably, if not with deliberate indifference, to his need to be moved resulting in the aggravation of plaintiff's already injured elbow. The court granted plaintiff leave to proceed on those grounds. (*See* dkt. #12, at 3.) Indeed, obesity is an objectively serious medical condition. *See Est. of Simpson v. Gorbett*, 863 F.3d 740, 747 (7th Cir. 2017) (accepting defendants' concession that obesity was an objectively serious medical condition); *see also Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (condition diagnosed by physician as requiring treatment is sufficiently serious). Regardless, because a jury could reasonably find that plaintiff had an objectively serious medical condition requiring a lower

9

bunk, the court will continue to explore the second subjective element of his Eighth Amendment claim.

"Deliberate indifference" means that the official was aware that the prisoner faced a substantial risk of serious harm but disregarded that risk by consciously failing to take reasonable measures to address it. *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997). Deliberate indifference constitutes *more than* a negligent act, or even grossly negligent act, although it requires something less than a *purposeful* act. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). The threshold for deliberate indifference is met where: (1) "the official knows of and disregards an excessive risk to inmate health or safety"; *or* (2) "the official [is] both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," *and* he or she draws that inference yet deliberately fails to take reasonable steps to avoid it. *Id.* at 837.

Also, to prevail on his deliberate indifference claim, plaintiff must show that defendants' actions *caused* his injury. *Herzog v. Vill. of Winnetka*, 309 F.3d 1041, 1044 (7th Cir. 2002) ("[T]he ordinary rules of tort causation apply to constitutional tort suits."). Causation is normally a question for the jury to decide. *See Gayton v. McCoy*, 593 F.3d 610, 624 (7th Cir. 2010) ("only in the rare instance that a plaintiff can proffer *no evidence* that a delay in medical treatment exacerbated an injury should summary judgment be granted on the issue of causation"). Under Wisconsin law, a claim for negligence includes the following four elements: (1) a breach of (2) a duty owed (3) that results in (4) harm to the plaintiff. *Paul v. Skemp*, 2001 WI 42, ¶ 17, 242 Wis. 2d 507, 625 N.W.2d 860 (2001). As with deliberate indifference, to prevail on his negligence claims, plaintiff must prove

that defendants' conduct was "the cause in fact or a substantial factor in causing the eventual injury." *Ollman v. Wisconsin Health Care Liab. Ins. Plan*, 178 Wis. 2d 648, 666, 505 N.W.2d 399, 405 (Ct. App. 1993). "The requirement of expert testimony is an extraordinary one." *Racine Cnty. v. Oracular Milwaukee, Inc.*, 2010 WI 25, ¶ 28, 323 Wis. 2d 682, 781 N.W.2d 88. "Causation is a factual question for a jury if reasonable people 'could differ on the issue.'" *Webber v. Armslist LLC*, No. 21-3198, 2023 WL 3945516, at *13 (7th Cir. June 12, 2023) (quoting *Morgan v. Pa. Gen. Ins. Co.*, 87 Wis. 2d 723, 275 N.W.2d 660, 666 (1979)).

### I. Plaintiff's Deliberate Indifference and Negligence Claims against Defendants Craft, Betancourt, Rocha and Cook Must Proceed to Trial

There are genuine issues of material fact that preclude summary judgment in favor of defendants Craft, Betancourt, Rocha and Cook. These defendants offer no argument about the subjective element of plaintiff's deliberate indifference claims, and plaintiff claims that each was aware of the substantial risk of serious harm once his lower-bunk restriction was in the inmate database, and they disregarded that risk by not moving him.[3] Instead, defendants argue that plaintiff cannot establish that they caused his injury.

As to Sergeant Craft, the parties offer conflicting evidence about whether he refused to move plaintiff even after plaintiff pleaded with him for a lower-bunk assignment. There

---

[3] The Seventh Circuit has concluded that a lower-bunk restriction, standing alone, does not put prison employees on notice of a prisoner's serious medical condition when the prisoner reported that he had a brain tumor, the lower-bunk restriction was *not* in the prison's database and the prison guards were unaware of the details of the prisoner's medical condition. *Chassie v. Marberry*, 847 F.3d 425, 428 (7th Cir. 2017). *Chassie* is factually distinguishable from this case because plaintiff's serious medical condition -- morbid obesity -- was obvious, as he weighed about 360 pounds, the lower-bunk restriction *was* in the prison's database, and at least some of the defendants were aware of this restriction.

11

also appears to be a dispute as to whether Craft offered to move plaintiff to a lower bunk, but plaintiff refused because he wanted to bunk with a friend, which if a jury credited, could reasonably be deemed an intervening cause of his injury. *See Broadfield v. Williams*, 768 F. App'x 544, 549 (7th Cir. 2019) (plaintiff's decision to stop taking prescribed drug was an intervening cause of his injury). All of these factual disputes will require a trial to resolve.

Likewise, there are key disputes of fact about whether defendants Betancourt, Rocha and Cook knew about plaintiff's lower-bunk restriction, and whether he asked them to move him to a cell with an available lower bunk. Each of those defendants asserts that plaintiff never told them about his lower-bunk restriction while plaintiff asserts that those defendants acknowledged the restriction but did not move him to a lower bunk. Although it is undisputed that Cook and Rocha lacked the authority to move prisoners on their own, plaintiff alleges that they did *nothing* after he notified them of the restriction, and a reasonable jury could conclude that they acted with deliberate indifference by failing to notify their supervisors that he needed to be moved to a lower bunk.

Thus, there are key credibility determinations for a jury to make about defendant Craft's response to plaintiff's request for a lower bunk and whether plaintiff asked defendants Betancourt, Rocha and Cook to move him to a lower bunk. *See Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge"). As noted, this leaves defendants claim that summary judgment is still appropriate on plaintiff's deliberate indifference and negligence claims because he provided no evidence that his left

elbow, arm and hand was further injured by his fall.  In particular, defendants argue that, without a medical expert, plaintiff cannot show his fall caused his injuries, having experienced similar reported symptoms years before his January 2020 fall.  They also speculate that plaintiff's uncontrolled diabetes could cause his ongoing symptoms.

Here, even without expert testimony, there is more than *some* evidence that plaintiff's fall from his bunk caused him injury, even if he eventually returned to a baseline of symptoms similar to that before his fall.  *Gayton*, 593 F.3d at 624.  For one, immediately after plaintiff's fall, he reported numbness in his fourth and fifth fingers of his left hand, as well as an inability to bear any weight on his left arm, or open and close his left hand independently.  Moreover, the emergency room doctor noted plaintiff's limited range of motion in his fingers.  Months after the fall, plaintiff reported to a nurse that the fall had worsened his left arm symptoms, *and* he told a doctor that some of his symptoms began after the fall.  Even Dr. Ribault did not rule out that the fall had *worsened* his elbow condition, as he only opined that the fall had no "significant impact on the pathology of [plaintiff's] elbow," and that it was more likely that the untreated gunshot wound and uncontrolled diabetes contributed to his ongoing symptoms.  Finally, a reasonable jury could infer that plaintiff's fall from the top bunk worsened his elbow condition, having weighed more than 360 pounds when he fell and claiming he landed on his left elbow.

In fairness to defendants, there are reasons for skepticism to the extent plaintiff claims that his arm and hand issues began after his fall, having apparently previously had similar symptoms that he now attributes to his fall.  Similarly, plaintiff's other conditions -- a past untreated gunshot wound and diabetic neuropathy -- could be causing or

13

contributing to his symptoms. A jury may also reasonably find important that plaintiff required relatively little treatment at the emergency room immediately after his fall. However, these arguments raising issues about plaintiff's credibility and the weight to be given his medical records, are also issues for the jury, not the court. *Anderson*, 477 U.S. at 255. Defendants reply that "the fact that [plaintiff's] arm required care does not in turn *necessitate* the conclusion that his fall was the reason for the problem," but this is obviously not the test to *prevail* on their motion for summary judgment. (Dkt. #46, at 4 (emphasis added).)

While plaintiff may, therefore, be limited by the jury in terms of injury that he can prove was caused by his fall, the court will not find as a matter of law that plaintiff's reported ongoing and worsened symptoms are insufficient to proceed to trial, much less that plaintiff is required to present expert testimony to hold defendants Craft, Betancourt, Rocha and Cook liable based on a lack of injury. For all the same reasons, plaintiff may also proceed against those defendants on his negligence claims.

## II. Plaintiff's Negligence Claim against McMartin will Proceed to Trial[4]

Finally, plaintiff would hold Unit Manager McMartin liable for deliberate indifference for not reassigning him to a lower bunk. While a closer question, plaintiff has offered no admissible evidence that she was aware of his lower-bunk restriction, and thus,

---

[4] Normally, this court would not exercise supplemental jurisdiction over state law claims, but because plaintiff's negligence claims against defendants "form part of the same case or controversy" as his federal claims against defendants Craft, Betancourt, Rocha and Cook, the court will exercise supplemental jurisdiction over them under 28 U.S.C. § 1367(a).

14

a reasonable jury could not conclude that she knew he faced a substantial risk of serious harm. *See Forbes*, 112 F.3d at 266. Although plaintiff asserts that McMartin acknowledged her error in not checking the unit logbook more closely to the institution complaint examiner which shows that she knew about his lower-bunk restriction, that after-the-fact admission alone does not establish her knowledge about the restriction *before* plaintiff fell.

That said, plaintiff has also alleged a state-law negligence claim against Unit Manager McMartin for which there is evidentiary support. Specifically, it is undisputed that Sergeant Craft documented plaintiff's lower-bunk restriction in the unit logbook that McMartin was supposed to, but did not, review. Accordingly, for the reasons discussed in the previous section, the court will not grant summary judgment on plaintiff's negligence claim against any defendant due to his having no retained expert or being unable to establish causation.[5]

ORDER

IT IS ORDERED that:

1) Plaintiff Dorin Ferguson's motion for summary judgment (dkt. # 39) is DENIED.

2) Defendants' motion for summary judgment (dkt. # 29) is GRANTED in part and DENIED in part as follows:

   a. Plaintiff's Eighth Amendment and state-law negligence claims against defendants Craft, Betancourt, Rocha, and Cook will proceed to trial.

---

[5] Now that the court has narrowed the claims in this case, the parties are reminded that they may contact the clerk's office to schedule mediation with Magistrate Judge Andrew Wiseman before trial, although I will play *no* role in that process.

    b. Plaintiff's Eighth Amendment claim against McMartin is DISMISSED with prejudice, but plaintiff's state-law negligence claim against McMartin will proceed to trial.

Entered this 30th day of January, 2024.

                        BY THE COURT:

                        /s/

                        _____
                        WILLIAM M. CONLEY
                        District Judge